Filed 1/16/25  In re Jac. H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JAC. H. et al., Persons Coming Under the Juvenile Court Law. | B335648 |
| | (Los Angeles County Super. Ct. No. 22CCJP02365A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DANIELA B. et al.,<br><br>        Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant Daniela B.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan G.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Father Jonathan G. and mother Daniela B. appeal from an order terminating their parental rights under Welfare and Institutions Code section 366.26.[1] They contend they established the beneficial parental relationship exception to prevent termination of their parental rights, and that the juvenile court abused its discretion when it failed to apply the exception. (§ 366.26, subd. (c)(1)(B)(i).) We conclude the juvenile court did not abuse its discretion and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Jonathan and Daniela have three children, J.G. (born 2019) and twins Jac.H. and Jan.H. (born 2014) (collectively, the

_____

[1] All undesignated statutory references are to the Welfare and Institutions Code, unless otherwise specified.

[2] The facts leading up to and including the jurisdiction and disposition hearing are summarized from our previous opinion, *In re J.H.* (May 10, 2024, B325348 [nonpub. opn.].)

2

children).[3] Daniela also has an older child, A.H., with another man. A.H. is not a subject of these dependency proceedings. Jonathan and Daniela arranged for the children to live with their maternal grandmother, Judith R., in November 2021. The parents lived at the paternal grandmother's home, which was a few blocks away, but regularly visited the children. Judith was designated as the prospective adoptive parent when the juvenile court terminated Daniela's and Jonathan's parental rights.

A.    *Prior Referrals and Dependency Proceedings*

Before J.G.'s birth, Jac.H. and Jan.H., along with A.H., were declared dependents of the juvenile court in two prior dependency proceedings. In 2016, the court found allegations of neglect were substantiated after Daniela reportedly attempted suicide by laying in the middle of the street and refusing mental health services. In 2017, the juvenile court sustained allegations that Daniela was incapable of providing regular care for Jac.H., Jan.H., and A.H. due to her history of illicit drug abuse and her current abuse of amphetamine and methamphetamine, and that Daniela and A.H.'s father had a history of mutually violent altercations. The court granted custody of A.H. to his father and returned Jac.H. and Jan.H. to Daniela's custody. The court terminated its jurisdiction over the children in 2018.

The Department received four referrals involving the family in 2021. Each referral was deemed inconclusive or unfounded. In November 2021, Jonathan and Daniela arranged

---

[3]    The twins share a last name with A.H.'s father. They discovered Jonathan was their biological father when they were three years old and Jonathan is the presumed father in this case.

3

for the children to live with Judith, citing the burden of the multiple referrals against them.

B.      *Current Dependency Proceeding*

On June 17, 2022, the Los Angeles County Department of Children and Family Services (Department) filed a dependency petition pursuant to section 300, subdivisions (b)(1) and (j), alleging seven-year-old Jac.H. and Jan.H. and two-year-old J.G. were at substantial risk of harm due to Daniela's substance abuse and Jonathan's failure to protect.  The juvenile court ordered the children detained with Judith, with whom they were already living.

1.      *Jurisdiction Findings and Disposition Orders*

Count b-1 of the section 300 petition alleged Daniela had a history of illicit drug abuse and was a current substance abuser, which rendered her incapable of providing regular care and appropriate supervision for the children.  The petition alleged Daniela was under the influence of drugs while the children were in her care, smoked a substance with a straw and foil over a flame in the presence of Jan.H., and that she overdosed on opiates requiring emergency medical treatment in 2020.  The petition further alleged J.G. was of "young age requiring constant care and supervision" and that Jac.H., Jan.H., and A.H. were prior dependents of the court due to Daniela's drug abuse.  Count b-2 alleged, in relevant part, that Daniela "created a detrimental and endangering home environment for the children in that the mother smoked an unknown white substance in the children's home," causing Jan.H. to feel ill.  Count j-1 duplicated the same allegations and language as count b-1.

4

The juvenile court sustained the petition at the September 7, 2022 combined jurisdiction and disposition hearing. Neither parent appeared but they were each represented by counsel at the hearing. In denying a request by Jonathan's counsel for a continuance, the court observed, "Parents are essentially refusing to participate in the case. They never responded to the [Department's investigator] for interviews. They are not [drug] testing. They didn't bother to show up today for their children's case. A continuance would not ensure father's appearance."

The children's counsel argued extensively, urging the court to sustain the petition as pleaded. The court found that the evidence, while circumstantial, was "stitched together carefully and in a compelling way" by the children's counsel and demonstrated a preponderance of the evidence for each of the allegations. The court acknowledged it is very hard to confirm drug use when parents refuse to test, but it noted the parents were "so willing to avoid all testing that they want to give up custody of their children and they don't even want to appear in this case." The juvenile court declared the children dependents of the court and removed them from both parents' custody with reunification services and monitored but separate visitation for each parent.

The juvenile court ordered Daniela to complete weekly drug and alcohol testing, a parenting program, and individual counseling. Jonathan was ordered to complete five random drug and alcohol tests, a parenting program, and individual counseling.

Daniela appealed. We affirmed the jurisdiction findings and disposition order, concluding substantial evidence supported

5

the juvenile court's orders. (See *In re J.H.* (May 10, 2024, B325348) [nonpub. opn.].)

2. *Six-month and 12-month Review Hearings*

On March 8, 2023, the juvenile court held the six-month hearing and found the parents were not in compliance with their case plan. The Department had reported Jonathan and Daniela failed to submit to drug or alcohol testing and failed to participate in the court-ordered parenting program or individual counseling. Neither parent consistently communicated with the Department.

Daniela, however, regularly visited with the children twice a week for three hours per visit. Judith reported Daniela came over to fold the children's clothes, organize their closets, and cook for and feed them during her visits. Jonathan also visited the children at least once a week for up to two hours. His visitation varied due to his work schedule. He played with the children during his visits but Jan.H. observed he was sometimes on his phone. Judith reported the visits with Jonathan and Daniela went well. In a May 22, 2023 child and family team meeting in which Jonathan participated, the team identified the children's need to "continue a relationship with their father and develop a bond with him."

In the 12-month status review report, the Department reported the children were responding well to Judith's care. The parents had limited contact with the Department and failed to comply with any part of their case plan. Daniela typically visited the children twice a week on Tuesdays and Fridays from 6:00 p.m. to 9:00 p.m., and Jonathan continued his weekly visits. Judith reported Daniela's visits were consistent and that Daniela

6

helped by folding clothes and feeding the children. Jan.H. reported Daniela helped them clean their room during her visits. Jac.H. reported Daniela brought him snacks but that she played with the girls, and not him, during the visits. Judith observed Jonathan's visits were often less than two hours. She reported he played video games with the older children.

When asked what he perceived to be the family's needs, Jonathan said, "'I want to have custody of my kids back and be a better father. Improve in all aspects of being a father and bond with them individually.'" Daniela likewise stated, "'I want to get my kids back and have our own place with them.'" But the Department recommended reunification services be terminated due to the parents' lack of progress in court-ordered services and that a section 366.26 selection and implementation hearing be set.

At the September 6, 2023 12-month hearing, the juvenile court found "[p]rogress by parents ha[s] been unsubstantial." The court terminated reunification services and ordered the matter set for a permanency planning hearing.

3.    *Permanency Planning Pursuant to Section 366.26*

In its January 10, 2024 section 366.26 report to the court, the Department recommended adoption as the preferred permanent plan. The Department emphasized that it would be detrimental to deprive the children of the stability Judith could provide.

The Department recounted the children's relationship with the parents. It reported Daniela helped bathe the children and clean their room during her visits. For his visits, Jonathan checked their homework, then watched movies with them or

7

played soccer with them.  Judith observed the children were happy to see their parents but understood the parents would leave once the visit was over, and their departure generally did not result in any change in their attitude or behavior.  But in September and October 2023, J.G. cried twice when Daniela left and once when Jonathan left.  She cried for less than five minutes each time.  Jan.H. expressed a desire to live with both Judith and Daniela and felt conflicted.

The Department stated the parents were not able to meet the children's needs due to Daniela's substance abuse and that both parents were unwilling to mitigate the issues that brought the family to the Department's attention.  The Department concluded, "severing the relationship . . . may cause emotional instability, however, the caregiver [Judith] expressed that she will continue to allow visitations with the children as long as the mother and father are appropriate."

The Department reported that Judith expressed a desire to provide permanency for the children through adoption, and the children were "'okay with adoption'" by her.  Nine-year old Jac.H. and Jan.H. confirmed their desire to be adopted and said they called Judith "'mom.'"  They reported being happy at Judith's home because "we have always lived here, this is home, even as a baby."  The children had strong attachments to Judith and relied on her for their daily needs.

Throughout the dependency proceedings, Jonathan and Daniela continued their weekly visits.  Daniela brought the children new bedding and plush toys during her visits.  Jonathan took the children outside to play with the dogs in the garden.  They also played games and watched movies.

On March 6, 2024, the juvenile court held the section 366.26 permanency plan hearing. The Department and children's counsel urged the court to terminate parental rights, arguing the parental-benefit exception outlined in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) was not met. The children's counsel argued the children had lived with their maternal grandmother since July 2022 and that they lived with her on prior occasions before the instant detention.[4] The children's counsel also argued the older children stated they were "ready to be adopted" by Judith.

Jonathan and Daniela, through separate counsel, objected to termination of their parental rights, arguing they maintained an ongoing and positive relationship with the children and severing the relationship would cause emotional instability. The parents further argued the Department impermissibly predicated its recommendation for termination of parental rights on their lack of progress in the case plan.

After hearing argument and reviewing the record before it, the juvenile court terminated Daniela's and Jonathan's parental rights. The court concluded that the parents failed to demonstrate that two of the three *Caden C.* elements were met. The court acknowledged the parents consistently visited and helped with the children, and that the children enjoyed the visits with their parents. But it found the "parents failed to develop the key bonds with their children early in their lives—in the children's lives," and they "failed to make the key bonds that

---

[4] The Department states the children began living with Judith in July 2022, when they were detained during the current proceedings. The parents acknowledge, however, that they arranged for the children to live with Judith in November 2021.

9

develop naturally when parents and children live together." The juvenile court found that the relationship between the parents and children was "a friendly relationship rather than a deep emotional bond that we see in healthy relationships between parent and children." The court concluded the termination of the relationship with the parents would not significantly disrupt the children's lives or their emotional wellbeing, and the benefits to adoption outweighed any detriment to the children. The juvenile court stated it was "not putting any weight on parents' inability to complete the case [plan]." After the court determined the beneficial parental relationship exception did not apply, it designated Judith as the prospective adoptive parent, noting she had expressed an intent to allow the children to continue visits with their parents.

Jonathan and Daniela each separately appealed from the court's order.

## DISCUSSION

A.    *Governing Law and Standard of Review*

The purpose of a section 366.26 selection and implementation hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) "If the court has decided to end parent-child reunification services, the legislative preference is for adoption." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["if the child is adoptable . . . adoption is the norm"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [state has a "compelling" interest in "providing stable, permanent homes for

children who have been removed from parental custody" and reunification efforts have been unsuccessful].)

"When the court finds . . . the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies." (*In re Elizabeth M., supra*, 19 Cal.App.5th at pp. 780-781; § 366.26, subd. (c)(1)(B); see *In re Celine R., supr*a, 31 Cal.4th at p. 53; *In re Matthew C.* (1993) 6 Cal.4th 386, 392.)

The beneficial parental relationship exception allows the court to order a permanent plan other than adoption if a parent demonstrates, by a preponderance of the evidence, "(1) regular *visitation and contact*, and (2) *a relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i).) It applies only in "'exceptional circumstances.'" (*Caden C.*, at p. 631; accord, *In re Celine R., supra*, 31 Cal.4th at p. 53.)

We apply a "hybrid standard of review" to the beneficial parental relationship exception. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 317; see *In re I.E.* (2023) 91 Cal.App.5th 683, 691.) The first two elements are reviewed for substantial evidence. (See *Caden C., supra*, 11 Cal.5th at pp. 639-640.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) As a reviewing court, we do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations

11

should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, at p. 640.)

As for the third element, we review factual determinations for substantial evidence and review the "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent . . . for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 640; see *In re I.E., supra*, 91 Cal.App.5th at p. 691.) "A court abuses its discretion when it ""has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"""' or when it "rest[s] a disposition on an error of law." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848-849; see *Caden C.*, at p. 641; *In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

B.    *The Juvenile Court Did Not Abuse Its Discretion by Concluding Jonathan and Daniela Failed To Establish the Beneficial Parental Relationship Exception Termination of Parental Rights*

Jonathan argues a legal guardianship with Judith would better serve the children's interests than adoption and termination of his parental rights. Daniela adopts Jonathan's arguments on appeal, and does not advance any separate arguments. We conclude the juvenile court did not abuse its discretion because Jonathan and Daniela failed to establish the beneficial parental relationship exception applied in this case. (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 636.)

1. *The First Element: Regular Visitation and Contact*

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) The parties agree, as do we, that Jonathan and Daniela met the first element. The juvenile court found at the section 366.26 hearing they maintained regular visitation and contact with the children during the dependency proceedings. Substantial evidence supports the court's finding the first *Caden C.* factor was satisfied.

2. *The Second Element: Beneficial Relationship*

The second prong of the beneficial parental relationship exception has two components: the child has a positive emotional attachment to the parent, and the child would benefit from continuing the relationship. (See *Caden C., supra*, 11 Cal.5th at p. 636.) Factors the court may consider include "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632; see *In re Katherine J., supra*, 75 Cal.App.5th at p. 317.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.,* at p. 632.)

Substantial evidence supports the juvenile court's finding that Jonathan and Daniela failed to show the second *Caden C.* element was met. The court determined there was no evidence of "a deep emotional bond that we see in healthy relationships between parent and children."

13

Here, J.G. was four years old at the time of the permanency planning hearing and had lived with Judith since 2021, when she was two years old. J.G. had spent at least half of her life with Judith. J.G. did not provide any statements during these proceedings due to her age and a speech delay. Jac.H. and Jan.H. were both 10 years old at the time of the hearing and had lived with Judith since they were seven years old. They had also previously been removed from the parents' custody in 2016 and 2017, when they were two and three years old. The evidence before the juvenile court was that the children lived a significant portion of their lives outside of their parents' custody. Jac.H. stated, "we always lived here [in Judith's home], this is home, even as a baby." The twins called Judith "mom," and Jan.H. felt "they are home when they are with Judith."

The twins' interactions with their parents and the way they spoke about them supported the juvenile court's finding that they lacked a parental bond with Jonathan and Daniela meeting the requirements of the second *Caden C.* element. The twins consistently stated they enjoyed Daniela's and Jonathan's visits because they bought them things and played with them, rather than because the parents provided for their daily needs or played a parental role. All three children accepted that their parents only visited and were not generally disturbed by their parents' departure after visits. Although J.G. cried during three instances when the parents left, the crying lasted no longer than five minutes.

At the time of the hearing, Jan.H. reported her relationship with Jonathan was "neutral." Before that, she indicated she was scared of him because she did not know him well. She became "comfortable" around him because he allowed her to watch

14

television.  Jonathan also acknowledged he needed to bond with the children.

Jonathan and Daniela argue the children's attachment to them is more than as mere "'friendly visitors,'" citing J.G.'s crying at the end of three visits and Jac.H.'s statement that he would tell "'mom, dad, and grandma'" if someone touched him inappropriately.  They also contend that Daniela helped bathe, clothe, and feed the children, and Jonathan checked their homework.  Indeed, it is undisputed there is some evidence of a positive relationship between the children and their parents.  Jan.H. expressed she wanted to live with both Judith and Daniela.  The Department observed, "severing the relationship . . . may cause emotional instability."  But "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C., supra*, 11 Cal.5th at p. 640.)  While it is commendable that Jonathan and Daniela regularly visited the children and assisted in their upbringing, substantial evidence supports the juvenile court's finding that they had "merely a good relationship" and not a beneficial relationship sufficient to meet the requirements of *Caden C.*

Jonathan and Daniela further argue the trial court improperly relied on the fact that they do not live with the children.  They argue every parent facing a section 366.26 hearing does not live with their child and thus that fact may not bar application of the parental-benefit exception.  Jonathan and

15

Daniela analogize their argument to one made in *Caden C., supra,* 11 Cal.5th at p. 637. *Caden C.* stated that "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception" because every parent facing termination of their rights has failed to make sufficient progress towards reunification. (*Ibid.*) Thus, "making a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute." (*Ibid.*) But *Caden C.* also explained that a parent's struggles toward reunification may not be entirely disregarded. Such struggles may be relevant to determining whether there is a negative effect on the parent-child relationship. (See *ibid.*)

Here, the juvenile court did not find the second *Caden C.* element was lacking because the children did not live with their parents. Rather, the court concluded the disruptions preventing the family from living together also prevented the parents from developing a key bond with the children early in their lives. As in *Caden C.,* the juvenile court considered the fact that the parents did not live with the children for much of their lives and that this circumstance had a negative effect on the parents' relationship with the children.

We recognize Jonathan and Daniela have endeavored to have a beneficial relationship with the children throughout the underlying proceedings. Even if we assume they have fulfilled the beneficial relationship element of the *Caden C.* analysis, however, the parental-benefit exception would not apply because substantial evidence supports the juvenile court's findings on detriment, as discussed below.

### 3. *The Third Element: Detriment from Termination*

The final element of the beneficial parental relationship exception is whether the stability and permanence that adoption would bring were outweighed by the harm to the children that would be caused by terminating their relationship with the parents. (See *Caden C., supra*, 11 Cal.5th at pp. 633-634.) As stated, the legislative preference in a permanency hearing for a dependent child is adoption, which mandates the termination of parental rights. (See *id*. at p. 631 ["'the norm . . . remains adoption'"]; accord, *In re Celine R., supra*, 31 Cal.4th at p. 53.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the juvenile court orders adoption. (See *Caden C.,* at p. 634.)

Substantial evidence supports the juvenile court's finding that termination of the parental relationship would not significantly disrupt the children's lives or their emotional well-being. The court found no evidence the children were upset when they could not see their parents whenever they wished or that they were depressed because their parents were not present. The children did not generally exhibit distress or changed behaviors from the parents' departure after their visits. Although J.G. cried after three visits, it was for less than five minutes. Judith stated the children expected the parents to leave. Jan.H. described her relationship with Jonathan as neutral.

By contrast, the record before the juvenile court demonstrated the children were strongly bonded with Judith: they had lived with her for two years or more by the time of the permanency hearing, they relied on her for their daily needs, they were willing to be adopted by her, and they considered her home

17

to be their home and their safe place.  The juvenile court thus found that "the children are so bonded with the maternal grandmother" that no detriment would result even if Judith decided not to continue visits with the parents after adoption. Indeed, Jonathan acknowledged, "there would not be a 'new family'; the children would remain in the same home, with the same caregiver, as they had before."  The juvenile court properly considered the benefits that Judith could provide through adoption against any detriment to the children from the termination of their relationship with Daniela or Jonathan.  (See, e.g., *In re N.S.* (2020) 55 Cal.App.5th 816, 842, 850-851 [parental benefit exception did not apply where child had lived with grandmother for most of his life, was happy and thriving in her care, and had repeatedly expressed his desire to be adopted by her; although child enjoyed weekly visits with mother and wanted them to continue, relationship was not that of parent and child, and he did not want increased visitation or show distress when separating from mother].)

Jonathan and Daniela argue legal guardianship, rather than adoption, is the better choice in this case because it provides stability and permanency for the children without the detriment of severing the parent-child relationship.  They contend the Department acknowledged that "severing the relationship . . . may cause emotional instability," and Jan.H.'s statement that she wanted to live with both Judith and Daniela is evidence of detriment to the children from severing the relationship.  They assert the juvenile court improperly relied on Judith's promise to allow them to continue visiting the children, but that such promises cannot alleviate the detriment.  (See *Caden C., supra*,

18

11 Cal.5th at p. 633 ["courts must assume that terminating parental rights terminates the relationship"].)

These arguments ignore the legislative preference for adoption. (See *Caden C., supra*, 11 Cal.5th at p. 631.) They also mischaracterize the juvenile court's ruling. The court did not base its decision to terminate parental rights on Judith's promise to continue visits. Rather, the juvenile court expressly found the children would not be harmed even if Judith decided not to allow further visitation with the parents because the children were "so bonded" with Judith. *Caden C.* instructs juvenile courts to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. . . . [T]he effects might include emotional instability." (*Caden C., supra*, 11 Cal.5th at p. 633.) But "a new, stable home may alleviate the emotional instability . . . providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

In all events, we do not reweigh the evidence on appeal and substantial evidence supports the juvenile court's finding on the third *Caden C.* prong. Under the circumstances presented, we cannot say the court's termination of parental rights was arbitrary, capricious, or otherwise an abuse of discretion. (See *Caden C., supra,* 11 Cal.5th at p. 641.)

## DISPOSITION

The juvenile court's order terminating Jonathan's and Daniela's parental rights is affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.

FEUER, J.